THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR23-159-RSM |
| Plaintiff, | ) | |
| v. | ) | DEFENSE SENTENCING |
| | ) | MEMORANDUM |
| TAMARA KING, | ) | |
| Defendant. | ) | |

## TABLE OF CONTENTS

I.   Introduction .................................................................................................. 3

II.   BackGround: How Did Tamara King Get Here? ...................................... 4

   A.   Tamara's Desire for Affection and Partnership .................................... 4

   B.   Paul Waln, the Con Artist ..................................................................... 6

   C.   Love Bombs ........................................................................................... 8

   D.   "The Sting" .......................................................................................... 12

   E.   Exploiting the Trauma Bond ............................................................... 14

   F.   Paul Was the Architect of the Fraud ................................................... 17

   G.   Paul Directed the Movement of Funds ............................................... 19

   H.   Epistemic Asymmetry ......................................................................... 21

   I.   The Trauma Bond Endures .................................................................. 22

   J.   Paul's Pattern of Meeting, Using, and Blaming People ..................... 23

   K.   Tamara Has Not Pursued Wealth and Is Motivated to Repay Investors ........ 26

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

III.    Objections to the Guidelines ................................................................................. 27

    A.    This Court Should Reject the Trial Tax ......................................................... 27

       1.    The trial tax adds to the already-pervasive pressure to plead guilty. .............. 27

       2.    Section 3E1.1 unconstitutionally punishes those who exercise the right to trial. 30

    B.    Tamara Accepts Responsibility for the Harm Caused ..................................... 31

    C.    Tamara Did Not Obstruct Justice ................................................................... 32

    D.    The Fraud Guidelines Are Flawed .................................................................. 33

IV.    Sentencing Considerations ................................................................................... 35

    A.    Retribution .................................................................................................... 35

    B.    Deterrence and Incapacitation ....................................................................... 36

    C.    Rehabilitation ................................................................................................ 37

    D.    Sentence Disparities ...................................................................................... 38

V.    Conclusion .......................................................................................................... 42

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## I.   INTRODUCTION

When Paul Waln met Tamara King, he saw the answer to his problems: a trusting woman with a good credit score. He romanced her with ruthless efficiency, identifying what she wanted in a mate and presenting himself as a true life partner—her perfect match.

Tamara loved Paul, and he used the idea that their love was unique and vital to achieve his goals. He brought Tamara into his world of real estate development/flipping, syndications and financing. Paul schmoozed with investors, gained their trust and hers, and advertised unrealistic returns. He was the ideas guy—the person who suggested borrowing money from Halcyon, authorized the transfer of funds as CEO, and told accountants they were loans for tax purposes. Paul influenced Tamara's decisions throughout their business relationship even after their romantic relationship ended—a fact he repeatedly admitted before any criminal investigation.

Although the money went into Tamara's account, Paul benefitted from this arrangement because she paid all family expenses: rent, utilities, food, entertainment, cars, and clothes. Understanding the dynamics of Paul and Tamara's relationship is essential to understand how Tamara—a woman without a criminal history—became involved in this scheme. One can accept the jury's verdict and also accept Dr. Chitra Raghavan's explanation of how Paul's behaviors and the dynamics of their relationship influenced Tamara. Ex. 1 (sealed). The jury's verdict is not irreconcilable with the fact that Tamara was sucked in by Paul's confidence scheme and thus less culpable.

This Court sentenced Paul to serve 33 months in prison. If the Court believes Tamara should be sentenced to prison, the sentence should be no longer than that of Paul. He was the architect of this fraud. He benefitted enormously from the fraud. And he—not she—repeatedly lied to investors. Paul is a con artist, a grifter, a swindler. Tamara is not.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 3

Tamara will face additional punishments Paul will not. Both will pay restitution jointly and severally. But Paul is required to forfeit only $156,477, whereas the government seeks over $3 million in forfeiture from Tamara in addition to restitution. She will owe more in back taxes. And she—not him—had her face in an article about her conviction. Alexis Weisend, *Former Eastside real estate broker convicted of fraud scheme*, Seattle Times, Dec. 19, 2025 (https://www.seattletimes.com/business/real-estate/former-eastside-real-estate-broker-convicted-of-fraud-scheme/); Julia Dallas, *Former Eastside real estate broker convicted of scheme that stole over $2 million*, MyNorthwest, Dec. 22, 2025 (https://mynorthwest.com/crime-blotter/former-eastside-real-estate-broker-convicted-of-scheme-that-stole-over-2-million/4176230).

Tamara listened to and read every single word of the Halcyon investors and the suffering to which she contributed. She acknowledges she played a part in their suffering. Ex. 2, Tamara's Letter. Tamara hopes to make them whole—a task that will take years of hard work in whatever job she can find in the community.

## II.    BACKGROUND: HOW DID TAMARA KING GET HERE?

### A.    Tamara's Desire for Affection and Partnership

Tamara was born and raised in Orange County, California. Her parents married at a very young age, and Tamara was born when her mother was only 19 years old. Her father worked, and her mother stayed at home to raise the two children. But her mother struggled to show affection to her two daughters, and Tamara was largely left on her own. When both parents were home, they bickered. Although neither parent was abusive, the home was not very happy, nor did her parents model the kind of partnership Tamara had hoped to find.

Growing up, Tamara was painfully shy and tended to keep to herself. She struggled to initiate conversation in large groups and had a difficult time accepting male attention. Tamara did not mind being alone, so she went through periods without many

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

friends, but she yearned to find someone who understood her, made her comfortable, and appreciated what she had to offer.

Tamara was an average student, earning mostly B's, a few A's, and the occasional C's. When she graduated from high school, she was not motivated or encouraged to continue her education. She began working at Tony Roma's, where she met her first husband. At the time, he was a student and had a part-time job and bad credit. She fell in love and was devoted to their relationship and helping him improve his credit and position in life. They dated for three and a half years before marrying. Within six months of their wedding, Tamara discovered he was having an affair and ended the marriage, leaving her heartbroken and unable to pay their joint expenses.

After this jarring, emotional setback, Tamara moved to Seattle. For a year and a half, she dated a man who was ambitious, successful, confident, and abusive. Even though the abuse was not usually physical, he was demanding and, on one occasion, yelled, threw her clothing out the apartment, and hit her. Tamara remained in the relationship longer than she should before ending it.

When Tamara met John King, she was attracted to his mellow attitude and kindness. They were married within a year and half of meeting and had two daughters, Trinity and Jazlyn. Together Tamara and John weathered multiple moves, the financial downturn, and the challenges of raising young children. Over time, however, Tamara began to lose trust and faith with him. For example, when they met, John had told her that he had no criminal record, graduated from college in Arizona, and had twin half-siblings who drowned. When the two moved to Arizona, he confessed that he had been previously convicted of a crime. She forgave John and helped him get the record expunged. Then, she learned that he never finished his degree, and that he did not, in fact, have twin siblings who died. Over time, these big lies and little lies started to erode

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

her trust and sense of reality. Tamara also struggled with the stress of parenting their daughters while being the primary breadwinner.

When Tamara decided to end the marriage, she was proud of the way she and John handled the divorce and managed to stay friends. The end of her second marriage raised numerous questions for Tamara about her own identity and self-worth. At times, motherhood caused her to question whether her body and time were her own. Still shy and self-conscious about her body, Tamara got breast augmentation to help feel more confident. By the time she started dating again, she thought she had taken enough time to figure out the type of relationship she wanted. After years of a romance-free marriage, she was hoping to find someone passionate, who made her feel valued and beautiful, and someone interested in true partnership. That's when she met Paul.

Romance fraud occurs when a person is "searching for the 'perfect' romantic partner after some period of crisis. Eagerness for quick romantic commitment and lack of awareness of scam tactics can cause potential victims to overlook red flags." Ex. 1 (Raghavan Report) at 25.

### B.    Paul Waln, the Con Artist

Paul's confidence inspired many to trust him with their hopes, dreams, and retirement funds. But he overpromised and underdelivered. He blamed others or circumstances outside his control for his failures. His overconfidence, desire for fortune, and penchant for blaming others did not begin when he met Tamara.

According to Paul, he was "the top producing sales team leader in the state of Washington" for "the top producing real estate brokerage in the world," Ex. 3 at 8,[1] and at one point was the 11th in the country and 27th in the world, *id.* at 10. He "owned probably eight-plus million dollars' worth of real estate, had a pension fund, a large cash value of insurance policy, collectibles, 11 cars, boat, an airplane, hangers in three

---

[1] Pin cites to the record refer to the ECF page number.

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

states." *Id.* at 29. He enjoyed extraordinary wealth and success until "things started to turn to biscuits" in 2007. *Id.* According to Paul, the bookkeeper approached him crying and said that she had not been paying taxes for approximately eight years, *id.* at 30–31, and he owed about one million dollars, *id.* at 32. The IRS seized all his assets, including "assets there was no way anybody could find" and "stacks of gold." *Id.* at 32. As Paul tells it, he also had the misfortune of having all creditors call a credit line. *Id.* at 34–35. This was, of course, not his fault, and he was on the verge of "a $40 million payday." *Id.* at 34.

Despite his anger and embarrassment, Paul was willing to disclose the failures of his business to potential investors and Tamara because—in his mind—he was not to blame, the financial crisis or his bookkeeper were. But he did not mention his former clients to those to whom he overpromised and under delivered. One such person contacted him years later after receiving a promotional email, who wrote, "I'm very frightened that you are back in the real estate business and taking investors." Ex. 4.

Paul's confidence did not decline with the market. With Halcyon, Paul advertised "an annual return on cost of at least 20%." Dkt. 182-2 at 3 (Ex. 100). Everyone who knew Paul described him as an exceptional salesman. He was warm, cordial, and friendly. Dkt. 202 at 181–82[2] (describing Paul's personality and how he presented his expertise). He could command the attention of a party with his sales pitch. Dkt. 204 at 563–64 (Ragan Pierce described Paul as "a smooth talker, very articulate, could carry on a conversation with anybody."); Dkt. 206 at 968 (Jason Haubry: Paul was an "excellent" presenter, a "very good communicator," and "a very good salesperson"); *id.* at 941 (Lisa Hadler: Paul was a "very good presenter," "confident," "knew how to speak to a room, and could negotiate afterwards with the investors to talk with them after the fact."); *id.* at 988–89.

---

[2] Pin cites to the trial transcript refer to the page number of the .pdf.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 7

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Investors were impressed by his radio advertisements and sales presentations. Dkt. 202 at 162–63, Dkt. 203 at 369–71. He had a knack for drawing people in, gaining their trust, and learning about their deepest hopes and dreams. After contacting Paul online, Mr. Fitzgerald met with him one on one and shared details about his goals and finances. Dkt. 202 at 140–41. Mr. Speck brought all his savings to Paul based on his belief that Paul was successful and an expert. Dkt. 203 at 167.

Despite these failures, Paul was fixated on wealth and status. In private memos, he manifested high earnings without much work and was fixated on the wealth and stature he enjoyed before 2008. In July 2012, his "short to mid-term goals" included "$400,000+ per year consistent income from HTI with 15-20 hours per week work time." Ex. A-808 at 6. Within a year, his priority list included purchasing a boat and having a net worth over $4 million. Ex. A-821 at 2. And in a questionnaire he completed in December 2015, in a moment of reflection, he identified "losing $10m+ in 2008" as a major transition within the past two years. He projected, however, that he would "end the year at about $900k in income growing towards the goal of $4m." Ex. 5.

## C.    Love Bombs

When Tamara met Paul met in June 2012, he was as charming, intelligent, and charismatic with her as he was with investors. The courtship was romantic, passionate, and consistent with patterns of romance fraud. *See* Ex. 1 at 5–6 (describing the stages of romance fraud, which begin with "the victim's desire for a partner," "the presentation of a seemingly ideal match," "a period of building trust and affection").

Paul began with love bombing, "an intense, swift process with extravagant gestures designed to disarm victims without force." *See* Ex. 1 at 4–5. He disclosed personal details about his life early in the relationship. Through extended email correspondence, he learned what Tamara desired in a partner. He asked for and received

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

a list of the qualities she sought in a partner. Dkt 183-1 at 441 (Paul sends the relationship workshop exercises), *id.* at 437-38 (Tamara's list). Paul presented himself as the type of partner she was looking for and emphasized his love of children, *id.* at 434, his motivation and drive, *id.* at 435-36, and acknowledged her desire for "a true partner," *id.* at 443, and someone who had learned from past mistakes, *id.* at 455-457 (Paul's "Life Story"). He emphasized that "the woman of his dreams" was someone he could "join forces with" to build a future with him together as "half of a partnership." Dkt. 183-1 at 449, 456–58. Paul told her that she was his "ideal woman." *Id.* at 460.

Paul pursued rapid intimacy and disclosed personal details about his past marriage, his business failings, and his son within days of meeting Tamara and literally wrote her "his story." *Id.* at 434–436. Such apparent vulnerability is common in love bombing, Ex. 1 at 5, and the way Paul presented himself as an open book made her feel valued. This degree of attention and affection, and the way Paul described the relationship was the type of overwhelming kindness that felt "unreal." Ex. 1 at 5. Paul instilled in Tamara an "exaggerated sense of sacredness and specialness in the relationship." Ex. 1 at 7.

Within a week, Paul began pressuring Tamara to formalize the relationship. *See* Ex. 1 at 5 (noting fraudsters mention commitment early on and pressure victims to formalize the relationship). Within a month of meeting, Paul started creating for Tamara a plan for their future, which—in his mind—included the perfect wedding (on the perfect date of his choosing), paying cash for an engagement ring, and a luxury vacation. Dkt. 183-1 at 470. Paul told Tamara that he loved her after their third date the morning after she had been sick from drinking too much. Within two months of meeting, Paul called Tamara his "one great love." Ex. 6; *see also* Dkt. 183-2 at 13 ("I simply adore being with you as a couple Tamara . . . I am both committed to and excited by the reality that I will soon be your husband and that I am already your soul

mate for life."). Just two months after meeting, Paul started to talk about getting engaged no later than their six-month anniversary and married no later than their one-year anniversary. Dkt 183-2 at 14. By September 2012, Paul began talking about moving in together in the Halcyon building in West Seattle because he "hate[d] not being together." Ex. 7 at 3. When talking about the move, Paul emphasized that Tamara's continual physical presence was essential to his own happiness and success. *Id.* ("I derive a huge sense of comfort and stability just having you with me.").

By consistently talking about their relationship as special, preordained by God, and unique, Paul increased the stakes of disagreement, resistance, and ending the relationship. His power was initially less about physical intimidation or fear, but about the possibility of losing a love that was so rare and precious. *See* Ex. 1 at 7–8 (describing the tactics of coercive control, which includes a "fabricated emotional bond [that] traps the victim into believing that this is the ultimate form of love they can achieve"). The aggressive courtship and intimacy are consistent with the love bombing dynamic. Ex. 1 at 13–15.

Paul began expecting and subtly demanding more from Tamara. He set her schedule. Dkt. 183-2 at 1. He began suggesting that she brand herself with his family crest. Dkt 183-2 at 6. In his list of qualities he "must" have in a partner, Paul included "feminine," "takes good care of herself (hair, pedicure, manicure, etc.)," and indicated a "strong preference" for a woman whose "weight [is] under control (looks good in a bikini, and comfortable with herself)." Dkt. 183-1 at 430–31. Tamara internalized those demands and his consistent comments about how she should look and dress. Paul regularly expressed (and demanded) how the home should look, which brands to buy, and what Tamara's last name should be. Dkt. 183-2 at 11–12. When they argued, Paul would remind Tamara that their love was sacred and special and emphasized that

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 10

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

disagreement would undermine the family. *See* Dkt. 183-2 at 18 (Paul emailed Tamara a photo of their family at the wedding after a fight).

These are all tactics of coercive control. *See* Ex. 1 at 7–8 (describing the system of manipulation that exploits the fear of losing the "ultimate form of love"); 18–22 (describing examples of each aspect of coercive control present in Tamara and Paul's relationship—isolation, microregulation, intimidation, bullying, manipulation, deprivation, sexual abuse, and economic abuse). Even if Tamara initially pushed back, she gave in to Paul's various demands—from car color, to ring shape, to taking his name. Dkt. 183-2 at 11–12. She began working for Paul to spend more time with him. They wed on the date Paul envisioned. She took his name. She got the tattoo of his family crest after he threatened to call off the wedding.

Tamara is certainly intelligent and assertive, but that does not mean she was immune to this type of manipulation or naivete. Tamara's daughter Jazlyn has seen her mother in multiple of committed relationships over the years. She believes Tamara is naïve and wants desperately to rely on and trust her partner. Ex. 8, Jazlyn's Letter. Jazlyn has seen Tamara "time and time again . . . get tricked by and lied to in her relationships and family bonds." *Id.* at 1. Tamara "doesn't want to doubt the capabilities of the person she's with; she's always encouraged me to be the best self I can be and that's always given me courage. Unfortunately, I feel like others have used her support to trick her into thinking something is okay or is going to work out when it doesn't." *Id.* at 2.

One does not need to be stupid or meek to be susceptible to manipulation. Women deceived in romance fraud "tend to be trusting, optimistic, and eager for love," and their "feelings of loneliness and social isolation increases susceptibility, especially if they are emotionally vulnerable due to past relational failures." Ex. 1 at 24–25. These are the characteristics and personality traits Tamara exhibits. *Id.*

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### D.    "The Sting"

Paul presented himself to Tamara as a temporarily embarrassed millionaire. According to Paul, he had run successful companies for years, owned numerous homes, and earned millions of dollars. *See, e.g.*, Dkt. 183-1 at 455 ("I rose to the top of my profession, surrounded myself with money and things. I also earned distinctions that money cannot buy . . . ."). He was educated, sophisticated, and intelligent. His success was hampered by others—a bookkeeper contributed to his failure to pay taxes for years, , Ex. 3 at 5-6, and the financial crisis of 2008 undermined the success of his real estate business. Although Tamara had experience in real estate, her limited time in the industry was not nearly as long or successful, and the transactions she handled were not complex. This power imbalance helps explain why she accepted his explanations. Ex. 1 at 6.

Shortly after meeting Tamara, Paul began talking about his financial and business goals. In his first "reality," he advertised that his business, HTI Wealth Creation Group, "consistently and easily makes $400,000+ per year" working 15–20 hours each week. Dkt. 183-1 at 459. Approximately two months into the relationship, Paul began to talk to Tamara about his plans for "financial recovery that will far exceed anything I've accomplished in the past!" Dkt. 183-2 at 13. Within three months of meeting, the "reality" he projected for himself included earning $60,000 per month from contracts and $50,000 each month in commissions. *Id.* at 14. He regularly referred to projects as providing the potential to earn hundreds of thousands of dollars. *See, e.g.*, Ex. 9 at 4 (describing "put[ting] together the deal that has the potential to make us $700k and change the direction of the company").

These goals were neither realistic nor possible with his looming IRS debt and potential bankruptcy. Tamara was his solution.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 12

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

With the help of lawyers, Paul looked for a way "to keep [his] income low and get past the bankruptcy and expose as little future income as possible to [his] settlement agreement while behaving in a legal, moral and ethical way." Dkt. 183-2 at 212. Because of his significant debt to the IRS and potential bankruptcy, and financial obligations to his ex-wife, Paul convinced Tamara to create new companies and hire him as the CEO. *Id.* at 212–13. In an email to lawyers, Paul explained his compensation would be low. *Id.* at 2. Tamara would pay all expenses. In other words, he joked, he "would become a 'kept man.'" *Id.*

The businesses in Tamara's name would assume names similar to Paul's previous businesses. Instead of HTI Wealth Creation Group, Inc., the business would be HTI Wealth, LLC. A-211 at 1. Paul wrote about this plan in dramatic, existential terms:

> If I follow the plans discussed above then I have what I believe to be a high probability of eventual professional and financial recovery and success in addition to finally being clear of the immense pressure of a pending bankruptcy, IRS offer and compromise and family law issues necessary to care for my son.
>
> If I fail to follow through on the plans discussed above I see no other outcome than complete financial ruin, being completely shut down, any income I do make being garnered by the IRS and professional devastation.
>
> There is really no option, in my opinion, other than to proceed with the plans I have outlined above.
>
> Sincerely,
>
> Paul Waln
> CEO
> HTI Wealth Creation Group, Inc.

Dkt. 183-1 at 400.

An intense emotional connection followed by the disclosure of a financial crisis is typical behavior of those who take advantage of romantic partners for financial gain. Ex. 1 at 5. Paul's plan put tremendous pressure on Tamara. Not only was she responsible for helping him through the IRS debt, avoiding bankruptcy, and running a

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

successful business, her failure would cause Paul "professional devastation" and "complete financial ruin." *Id.*

The arrangement worked well for Paul. Tamara paid all joint expenses, and he received a small salary. The prenuptial agreement kept Tamara's earnings out of the hands of the IRS, his creditors, and his ex-wife. Paul instructed Tamara on what to include as "her property" in the prenuptial agreement to ensure he—not the IRS or his ex-wife—would have access to the funds. Ex. 10. With this arrangement, Tamara paid all joint expenses and even his personal expenses, which were considerable. The arrangement and Tamara's access to credit gave Paul the ability to live the life he wanted. All liabilities would be in Tamara's name.

E.    Exploiting the Trauma Bond

Paul used the "specialness" of their relationship to take from Tamara what he wanted. When that didn't work, Paul threatened to leave her. He sent a suicide letter to an ex-girlfriend. Dkt. 183-2 at 84. He gambled, drank heavily, and abused medications. *Id.* at 85; 27. He accused Tamara of cheating. He broke things and screamed. Ex. 9 at 3 ("I hated that you would yell and scream and break things (your sunglasses, keychain, and bedpost, etc.) and then leave, sometimes all day and/or night."). He demanded sex, and she acquiesced. Ex. 11A; A-838. He blamed her for his actions and failing to understand that expressing anger toward him could be costly "if it continues." Ex. 12 at 2. And Paul threatened to leave Tamara with significant debt, which was all in her name. Ex. 13 at 11 ("Tamara: The reality is that Paul has threatened to leave me holding the debt that we've incurred multiple times over the years . . . .").[3] This

---

[3] In numerous documents, Paul has admitted to influencing and pressuring Tamara to take on debt. In 2017, when Tamara wrote this, he asked not to address "threats that may have been made or may have been in one of our many misunderstandings" in an email to Michelle Bomberger. Ex. 13 at 8.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

dynamic is consistent with the pattern of coercive control, where the abuser "blames the victim because she failed to understand his . . . needs." Ex. 1 at 8.

Tamara was loyal to Paul—consistent with trauma bonding. *Id.* at 8 (one person submits to the demands of the other out of fear of further abuse or losing the relationship). When Paul spiraled out of control, Tamara talked with him, engaged the assistance of a counselor, and encouraged him to seek medical care. Ex. 14 at 2. For example, after a fight, Paul got drunk at a bar midday and tried to go to a strip club; Tamara helped him search for outpatient treatment programs. *Id.* at 2–3. When Paul's account was seized, he spiraled and left to play poker, while Tamara worked to figure out a solution. Ex. 9 at 4.

Tamara's writings throughout her relationship with Paul consistently described her experience of being pressured to borrow and spend money despite objections, long before she was investigated or charged.

For example, in September 2013, [4] three months after Paul and Tamara married, the two were having relationship challenges and sought the help of a marriage counselor. Before the initial meeting with the counselor, Tamara wrote a letter that outlined the issues in their relationship. Notably, Tamara emphasized Paul's demands for money, luxury items, and playing poker. Ex. 15. She recounted that he spent $6,000 playing poker in a span of six weeks. *Id.* at 1. Tamara's notes to the therapist emphasize that Paul's focus on purchasing expensive, brand-name items was a source of tension in their relationship, and he—not Tamara—was the person in the relationship fixated on material wealth. *Id.* at 1–2. In addition, Tamara relayed to the counselor that Paul insisted that she conform to his way of doing business, and when she pushed back, he questioned her desire to be part of the business and projected a catastrophic outcome if

---

[4] Metadata from the native file confirms this document was written by Tamara King on September 25, 2013.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 15

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

she withdrew. *Id*. Tamara documented how Paul pressured her to take on more debt, to have sex with him on demand, and that she acquiesced to his insistence. *Id.* at 2. Finally, Tamara shared with the counselor that, when Paul became angry, he acted violently, breaking a bed post, sunglasses, and a keychain, or he ran away and spent recklessly. *Id.* Tamara's daughter Jazlyn remembers these violent outbursts and yelling. PSR ¶ 94; Ex. 8 at 2.

After a fight in 2014, Paul and Tamara exchanged writings back and forth. Ex. 9. Paul asked Tamara a number of questions, including the following exchange:

> **Are we afraid of losing money and wealth more than stability for the kids and ourselves?** I am not afraid of losing money or wealth or stature. That has always been something that you are WAY more concerned about than me. You have an all or nothing mentality that carries through in most everything.
>
> I would be very happy to trim down our spending so that the money we have will last longer so that we can get through all of the legal stuff and then build our lives from there.

*Id.* at 4–5. Paul's writings to himself and others consistently show his obsession with wealth and anger about not being wealthy:

> I don't want you to be angry with me. Have all the feelings you want, I know you are entitled to them. I carry enough guilt as it is. I am so fucking pissed at myself I can just barely stand it. I made enough money to be safe three fucking times and I'm fighting for survival! Bad luck? Bad decisions? Maybe yes, maybe no. It still fucking hurts.

Ex. 12 at 2.

In every iteration of Paul's "reality" he sent Tamara, he emphasized his desire for high earnings, luxury items, and a high-end lifestyle. In July 2012, his "Focus Areas" included: earning "$250k or more per year freely and easily," paying "cash for a ring my fiancé adores and that I am proud of," a wedding "in a high-quality place/environment," and regularly playing poker. *See* Dkt. 183-1 at 469–71. He noted that "a great engagement ring, nice wedding venue, amazing honeymoon and June wedding are all very important to me." *Id.* at 470. In August 2013, after their wedding, Paul shared his "Priority List," where he assigned to himself the responsibility for buying a boat and piano, a "dream home," and an aircraft. Dkt. 183-2 at 16. In 2014, his

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 16

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

goals included being a member of the Bellevue Club and owning a boat, a home in Vuecrest, and a Rolex GMT.[5] *Id.* at 22. Tamara never sent anything of the like.

### F. Paul Was the Architect of the Fraud

Long before meeting Tamara, Paul had solicited money from the Halcyon investors. During their courtship, he created the Kahala syndication, as well. Tamara was not part of any of the conversations with attorneys about the formation of Halcyon or Kahala (including how the Manager of the syndications would be compensated). Ex. 17 (Paul emailed attorneys about Kahala, including compensation, but Tamara was not included).

Although Tamara owned HTI Wealth LLC, they were partners. Paul communicated directly with investors. He was responsible for obtaining funding, overseeing investments and managing risks, making financial decisions for the company, and being the asset manager for the syndications. *See* Dkt. 182-2 at 142–43. Throughout the operation of HTI Wealth/The Waln Team, Paul was the person who spoke directly with Halcyon investors and wrote updates about the status of the investment. *See* Dkt. 202 at 164–68 (Paul explained K-1 losses to Mr. Fitzgerald and sent emails to investors about the losses); Dkt. 182-1 at 115, 116, 119, 120, 122, 126 (emails to Halcyon investors written by Paul); Dkt. 203 at 371–73 (Paul spoke to Mr. Speck personally to allay his concerns reservations about the investment).

Paul's business practices were never formal or conventional. Paul transferred money regularly between business accounts and classified those transfers as loans guaranteed only by a promise to pay documented in informal memoranda. *See, e.g.*, Dkt. 183-1 at 339. ("[T]here was a transfer from Turnkey Construction Management to HTI. HTI was in need of funds and will repay the loan to TCM at the earliest possible

---

[5] Paul apparently got the watch he wanted. In the post-nuptial agreement, the parties identified the watch as his personal property. Ex. A-1125 at 9.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 17

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

opportunity."). He authorized loans against the units HTI owned. *Id.* at 350. He set the value of the asset management fee he would receive without a formal appraisal. *Id.* at 341. He authorized payment of Halcyon funds to his company based on his own estimation of the value of the work, instead of a contract. *Id.* at 358. And Paul moved money between his various companies to pay personal expenses and to buy himself a motorcycle. Ex. A-731 (personal coaching); Dkt. 183-1 at 362 (dietary supplements); *Id.* at 384 (a $500 "bonus" while in Las Vegas to be treated as a loan "when taxes are brought current"); Dkt. 206 at 982.

When Tamara began working with Paul and reviewing his files, she saw these memoranda and the loose accounting practices. The introduction of false ideas that are referenced later is a hallmark of romance fraud. Ex. 1 at 6. Tamara's exposure to these practices early in her time working with Paul made his later reference to similar practices seem unremarkable and normal. *See id.* at 16–17.

Consistent with the job description of the CEO, Paul directed the movement of money. He directed Tamara to transfer funds between the business entities and wrote memoranda to explain the purpose of the transaction. *See, e.g.*, Dkt. 183-2 at 103 (authorizing a short-term loan from Kahala to HTI Wealth for $60,000); A-1306 (authorizing a $60,000 loan against the Kahala investment units owned by HTI Wealth); Dkt. 182-1 at 151 (authorizing a $125,000 short-term loan from Halcyon to HTI Wealth with a 2% interest rate). In the beginning, he signed Tamara's name without her knowledge. Dkt. 182-1 at 146, 147; Ex. 3 at 10; Dkt. 204 at 530–32. Paul instructed Tamara to transfer money and how the money should be classified. Dkt. 182-1 at 156 (Paul emailed Tamara instructing her to transfer money from Halcyon to HTI with the memo "loan" then bonus from HTI to the president with the memo "LTO or Bonus."); *Id.* at 159 (authorizing a $500,000 bonus to Tamara). And when the Halcyon, Kahala, and Azalea properties were sold, Paul wrote memoranda directing where the

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 18

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

money would go. *Id.* at 153 (authorizing Halcyon's $900,000 purchase of investment units in Azalea after the sale of the Halcyon building); A-1329 (documenting the resolution of notes payable from The Waln Team to Kahala after the sale of Kahala building); Dkt. 183-2 at 133 (explaining the final disposition of Azalea investment units after the sale of the property).

### G.      Paul Directed the Movement of Funds

Throughout their business and personal relationship, before either faced criminal charges, Paul acknowledged he was responsible for the debts HTI Wealth/The Waln Team and Tamara amassed. In 2017, when the possibility of separation and divorce were becoming more likely, they discussed their relationship and the business. Tamara proposed a relationship contract. She specifically asked that the two figure out how to pay debt owed to the IRS and investors. Paul amended the relationship contract and sent additional documents to her to address the business needs. In the relationship contract, Paul suggested creating a post-nuptial agreement to address joint debt and give him 50% ownership of HTI Wealth, 1/3 ownership of Echelon, and assigning to him half of all assets acquired during the marriage.  Dkt. 183-2 at 32. (Paul's writing is in green). Paul also presented an action plan and proposed his own compensation. *Id.* at 16–17.

In October 2017, Paul and Tamara finalized, signed, and notarized a post-nuptial agreement. Ex. 16. In this agreement, Paul acknowledged that he "strongly influenced [Tamara] to accumulate the debts associated with Halcyon Apartments CC4R, LLC and Kahala Apartments, LLC incurred by HTI Wealth, LLC." *Id.* at 1. They agreed that "[a]ll Halcyon investment units owned by HTI Wealth shall be transferred to The Waln Team and their value applied toward the debt owed to Halcyon, originally incurred by HTI Wealth." *Id.* They also agreed "[a]ll Kahala investment units owned by HTI Wealth shall be transferred to The Waln Team and their value applied toward the debt

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

owed to Kahala, originally incurred by HTI Wealth." *Id.* at 2. Finally, they agreed that proceeds from the sale of a property in Ballard would be applied to pay the debt. *Id.*

In November 2017, with the divorce imminent, Tamara wrote to Paul about dividing up assets. Ex. 18. She expressed her view then consistent with her position now that Paul abused, threatened, and forced her to "do whatever unreasonable thing" Paul felt he "deserve[d] at that moment financially," which resulted in being $1.5 million in debt. *Id.* at 1. Paul's reaction to a conversation about the division of property was to say that he "will do [his] best not to retaliate." *Id.* at 1. Tamara's response long before the investigation began is contemporaneous evidence that her financial decisions were strongly influenced by Paul's pressure tactics.

In February 2018, Tamara wrote Paul about reducing business expenses and repaying debts. Tamara wrote, "With the debt the company owes as well as the taxes I owe from 2016 and 2017 plus our other smaller debt, we currently owe $1.5 million." Ex. 19 at 4, ¶ 3. She explained, "Since we haven't made anywhere near that much in the past several years and need to have that paid off within the next 1.5 years, we need to seriously cut down expenses in addition to making a lot more money than we've been making." *Id.*, ¶ 4. Tamara outlined what Paul had been telling her for years: he would make the money they need to pay their debts. The person who proposed delaying hobbies and vacations, saving, and spending less was Tamara, not Paul. She acknowledged that the debts and expenses accumulated over the years because of magical thinking and unrealistic expectations. *Id.* at 5.

In response, Paul admitted, "As to 'I've been telling you for years that I will make the money for the things we've gotten' you are correct. I truly believed that with all of my heart." *Id.* at 2, ¶ 1. In a moment of candor, he confessed to delusional thinking, he thought he could "make the pre-crash money [he] was making right away," but "for whatever reasons it has not materialized." *Id.* at 2. Paul acknowledged his view

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 20

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

that Tamara's added value to the business was her "credit and effort," and he would "bring my companies, experience, contracts, and effort to the partnership." *Id.*, ¶ 4. Paul did not dispute that he was the person who wanted to live in a penthouse. Ultimately, he agreed "we need to pay off the debt both because we owe it as well as to protect your credit and we need a plan to reach financial security . . . ." *Id.* at 3, ¶ 3. These statements caused Tamara to believe Paul would continue to work with her to repay debts and make money in the future. She believed that she could not resolve the debt without Paul's help.

### H.   Epistemic Asymmetry

Throughout their personal and professional relationship, Paul had significant influence over the substance of information provided to CPAs and attorneys. Early on, Paul took the lead to answer questions about the taxes for the Halcyon and Kahala syndications. Dkt. 183-1. When asked questions, Tamara consulted with Paul and included him on all emails. Dkt. 183-1 at 5 (emails between Paul and Dave Fleck, the CPA at the time). In 2017, when asked about whether the $600,000 transfer to Tamara was a loan or income for her 2016 income taxes, Paul had to provide the answers. *See Id.* at 83 ("I've done my best to answer your questions and explain things, but Paul may explain them differently. He is planning to deal with this Monday and feels like he can better handle it."); *id.* at 88 ("I'm sorry this took a week, but that was the best Paul could do. Below are his emails to me with the stuff he pulled together. I've saved everything in the cloud in the "Docs from Paul" folder."); *id.* at 89 (email from Paul indicating he saved the promissory notes); *id.* at 93 ("from Paul" answer to a question about the $600,000 transfer).

Even after the marriage ended, Paul communicated with CPAs about tax issues. *See* Dkt. 183-1 at 140 (Paul to Chris Newman); *id.* at 151 (same); *id.* at 173 (Paul communicating directly with Rick Walter in 2019); *id.* at 174 (Walter confirming he

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 21

talked to Paul to answer questions about the distributions of proceeds from the Azalea sale).

Paul also took the lead in communicating with attorneys. Email exchanges with lawyers at Equinox about the structure of the various entities were led by Paul. *See, e.g.*, *Id.* at 208; 212. Critically, he—not Tamara—was involved in the discussion about promissory notes. *See id*. at 220.

The way Paul consulted with legal and tax professionals explains why Tamara was willing to trust his input. *See* Ex. 1 at 17–18 (explaining epistemic asymmetry). And the fluency with which he discussed complex business deals and tax provisions lent credibility to his answers.

## I.    The Trauma Bond Endures

The government and probation cling to the "commonly held belief that coercive control and trauma bonds end when the relationship ends." Ex. 1 at 9; Sent. Rec. at 5–6; *see, e.g.*, Dkt. 209 at 1445 ("Ms. King was acting independently of Mr. Waln. She had divorced Mr. Waln. She's in a new relationship with Mr. Wright."). Contrary to those claims, research and clinical data have shown that the control and impact of the trauma bond endure long after the relationship ends. Ex. 1 at 9. People remain attached to the deceiver after the relationship ends. *Id.*

Even after the divorce, Paul continued to direct the finances of The Waln Team and shaped Tamara's understanding of the scope and responsibilities of the syndications' Manager. In June 2018, after the sale of Azalea, he directed Tamara how to reallocate investment units and funds. Dkt. 183-2 at 71. He told her to transfer the balance of remaining funds for Halcyon to Waln Team Investments. *Id.* She could not "do final bookkeeping with the accountant" or understand what to do without Paul's help. *Id.* at 3.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 22

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

In March 2019, he emailed Tamara about how to proceed with the debts. He reiterated that he worked with an attorney to protect the Manager of the syndications. Dkt. 183-2 at 68. Paul subsequently emailed Tamara a memorandum that outlined what authority he claimed the management agreement provided to make financial decisions and to repay the debt to Halcyon investors. *Id.* at 1–3. In June 2018, Paul continued to direct where money should go and promised Tamara that he would make a promissory note with all loans in his name. Ex. 20 Tamara consistently reminded Paul that money was owed to investors and must be repaid.

Even in 2019, Tamara referred CPAs to Paul to answer questions about the movement of money between the businesses. *See* Dkt. 183-1 at 174. These communications and the memorandum show Paul's continued influence over Tamara's financial decision-making.

### J.    Paul's Pattern of Meeting, Using, and Blaming People

Paul has consistently used wives and friends to create businesses in their names when he could not. This pattern began with Sheryl Waln, who worked with Paul for many years. Before meeting Tamara, Paul formed numerous entities, including HTI Wealth Group, HTI Wealth Creation Group, Inc., Home Team Property Management (HTPM). They owned multiple homes, cars, and a plane before Paul had to close his businesses due to unpaid taxes.

After his divorce from Sheryl, Paul and Tamara met and married. Paul suggested Tamara get involved in his businesses and orchestrated a system where all profits would be in her name (to avoid paying the IRS and his ex-wife), as would all debts.

After he and Tamara divorced, Paul moved to California and married another woman with whom he started The Waln Group, LLC. During this marriage, Paul and

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 23

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
**Seattle, Washington 98101**
(206) 553-1100

his then-wife created a series of YouTube videos,[6] which showcase an opulent home valued at $2.65 million. Ex. 21. His videos convey another pattern: Paul speaks at length about the benefits of borrowing money to make money and preaches about exponential wealth growth. After Paul was charged with this offense, his third wife filed for divorce. Apparently, during the marriage, they amassed debts: multiple credit cards, a personal loan, and four vehicles—a Porsche Cayenne (the car he wanted Tamara to buy, A-814 at 3), a BMW motorcycle, and two trucks. Ex. 22.

While this case was pending, five months after Paul's divorce, a woman contacted the U.S. Attorney's Office after she went on a date with Paul. Exs. 10; 11 at 2–3. During that date, he "was very animated telling [her] about" his pool service business, and his "plans to branch out and open satellite operations in other parts of the state." Ex. 23. Paul was, in fact, working for a company called Home Team Pool and Spa, which is owned and registered to his best friend. Exs. 23, 24. At some point before his sentencing, Paul married a fourth time. She owns a home in California valued at over $500,000. Ex. 25.

This pattern is consistent with the predatory behavior of swindlers who use romance for financial gain. Those "who commit financial or any other kind of fraud using interpersonal relationships (whether romantic or other kinds of trust relationships) typically present as charming and blameless, relying on these impressions to create trust and deceive." Ex. 1 at 9–10.

Paul also has a habit of using variations of the same name for his businesses. Many of Paul's companies were an iteration of "The Home Team" or his name. HTI Wealth, for example, stood for "Home Team Investments," and his previous company

---

[6] *E.g.*, Waln Group, *6 Pillars of Building Wealth Webinar*, YouTube (Feb. 23, 2023), https://www.youtube.com/watch?v=OxPW5TU89kU&t=1182s; Waln Group, *How to Increase Borrowing Power*, YouTube (Apr. 8, 2024), https://www.youtube.com/watch?v=N67dHW4K9e4&t=1s.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 24

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

was The Home Team. Paul was working as an "independent contractor," doing business as Home Team Pool Service.

Paul also has a pattern of finding a person or circumstances to blame for his business failures. To this day, he emphasizes his success in real estate and insurance—the end of which he blames on "the market crash of 2007 and the resulting recession." Dkt. 90-1 at 2 (Waln Letter). In April 2013, as Paul was working with lawyers to create HTI Wealth LLC in Tamara's name, he was writing internal memoranda, identifying people to blame for his business struggles. He blamed his ex-wife Sheryl for the company not having a formal monthly budget and being out of regulatory compliance. Dkt. 183-1 at 394. Paul blamed Nathan Clarenberg for going over budget on projects and losing "between $650,000 and $700,000." Dkt. 183-1 at 391; *see also* Dkt 183-1 at 374. He drafted memoranda falsely claiming to settle debts to Mr. Clarenberg. *See id.* As Azalea started to flounder, Paul blamed Mr. Pierce. When Paul met with the FBI in July 2023, he claimed Mr. Pierce suggested giving Tamara a $500,000 bonus to obtain funding to build homes. Ex. 3 at 11.

Paul has also implied and explicitly claimed that Tamara had an affair with Mr. Pierce, which is why Azalea (and ultimately Halcyon) failed. During his interview with the FBI, he implied that Mr. Pierce and Tamara were having an affair. *Id.* at 12. In a 2023, Paul's son was interviewed by the FBI. During that interview, he claimed Paul had hired a private investigator who discovered Tamara and Mr. Pierce had an affair. Ex. 26 at 3. He could learn this false information only from his father. After this Court sentenced Paul, his ex-wife Sheryl contacted the U.S. Attorney's Office, claiming Paul's attorneys forced him to take a plea, Ex. 27 at 5, and that Tamara and Mr. Pierce had an affair and colluded to claim Mr. Pierce had cancer because they knew Paul would be particularly sympathetic because he lost a friend to lung cancer, *id.* at 2–3. As she explained, these were the facts she learned from Paul. *Id.* at 1.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 25

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

In short, Paul has always found a way to get what he wants and still has not truly accepted responsibility.

### K.    Tamara Has Not Pursued Wealth and Is Motivated to Repay Investors

During the business and personal relationship with Paul, Tamara regularly reminded him of their debt and need to reduce expenses.

In contrast to Paul, Tamara has not continued to pursue a lavish, luxury lifestyle since the business failed in 2019. In the process of trying to finish the final real estate project managed by The Waln Team, Paul encouraged her to obtain additional lines of credit to complete the project. When the building ultimately sold for a loss, Tamara had to file for bankruptcy. She has not recovered financially or pursued any jobs in the real estate or financial industries.

In 2020, Tamara met Chris Weakley, and they began dating. At the time, he was a high school basketball coach. When he was offered a coaching position at a college in Saginaw, Michigan, Tamara moved with him and her daughter to support his career. They subsequently moved to Perrysburg, Ohio, and Johnstown, Pennsylvania, for his coaching career. Coaches at community and junior colleges do not command high salaries. Tamara, Mr. Weakley, and her daughter have struggled financially. Ex. 8 at 3. Tamara did not pursue a lavish lifestyle. To make rent, Tamara has worked as a receptionist, a Door Dash driver, a waitress/bartender, and as a flagger for PepsiCo.

After the jury's verdict, Tamara wished to save and make modest restitution payments to the victims. Her monthly cash flow is extremely limited and she has nearly nothing in savings. PSR ¶ 124. Tamara's efforts to make restitution payments were stymied when her relationship with Mr. Weakley ended, and she had to move from Pennsylvania to Ohio, where she lives with her daughter. Since the move, Tamara has

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 26

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

done some work for Mr. Weakley's basketball camps and has applied for numerous jobs. She remains committed to paying restitution.

## III.    OBJECTIONS TO THE GUIDELINES

### A.    This Court Should Reject the Trial Tax

This Court can categorically reject a particular Guideline based on a policy disagreement. *See Spears v. United States*, 555 U.S. 261, 265–66 (2009) ("district courts are entitled to reject and vary categorically from the . . . Guidelines based on a policy disagreement with those Guidelines"). When the Supreme Court made the guidelines advisory, it empowered district courts to eliminate the 34% marginal increase in the federal trial penalty that is imposed by §3E1.1. And that is only one reason why this Court should use the Guidelines calculations without the trial tax.[7] This Court should decide as a matter of discretion not to apply the trial tax regardless of which base offense level is adopted.

There are a number of reasons this Court should reject the trial tax. First, no policy rationale supports a Guideline provision that significantly and systemically increases the incentive to plead guilty when the federal guilty plea rate is already unhealthily high. Second, §3E1.1 creates unwarranted—if not unconstitutional—sentence disparities between similarly situated defendants.

### 1.    The trial tax adds to the already-pervasive pressure to plead guilty.

According to the Sentencing Commission, 97.7% of people convicted in federal court in 2025 pleaded guilty. U.S. Sent'g Comm'n, 2025 Sourcebook of Federal Sentencing Statistics, Table 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2025/Table11.pdf. The plea-to-trial

---

[7] The "trial tax" includes § 3E1.1(a)'s 2-level reduction for "acceptance of responsibility" and § 3E1.1(b)'s 1-level reduction by the government's motion.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 27

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

ratio cannot go much higher. The Sixth Amendment's jury trial right serves the vital purpose of "exposing to public scrutiny, and community approval or disapproval, just how our criminal justice system operates." *United States v. Tavberidze*, 769 F. Supp. 3d 264, 266 (S.D.N.Y. 2025) (Rakoff, J.). "Jury service preserves the democratic element of the law, as it guards the rights of the parties and ensures continued acceptance of the laws by all of the people." *Powers v. Ohio*, 499 U.S. 400, 407 (1991). The jury trial right was so important that it is "the only right secured in all state constitutions penned between 1776 and 1787 was the right to trial by jury in criminal cases." *United States v. Kandirakis*, 441 F. Supp. 2d 282, 310–11 (D. Mass. 2006) (quoting Akhil Reed Amar, *America's Constitution: A Biography*, 83 (2005)).

The demise of the trial undermines the broader criminal legal system because most rights held sacred by the system are tied directly or indirectly to trial. A system of pleas fundamentally undermines a check on the power of the government and a hallmark of popular sovereignty.

The expected absence of trial by repeat players creates perverse incentives that undermine the purported truth-finding function of a criminal trial. Defense attorneys lose the incentive to investigate and prepare trial defenses and instead dedicate resources to sentencing or plea negotiation. If the jury trial is to retain its function as the adversarial system's truth-finding procedure, a trial need not be held in every case; but trials must occur frequently enough so that repeat players in the system expect trials regularly and prepare cases accordingly. The high plea rate obfuscates the facts or questionable practices and, consequently, "reduces transparency and for that reason alone diminishes the quality of justice." *Id.*

"[P]lea bargaining pressures even innocent defendants to plead guilty to avoid the risk of high statutory sentences." Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1034 (2006). In this system, the decision to plead

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 28

guilty is—for a rational defendant—unrelated to guilt or innocence. Instead, the expected trial and sentencing outcomes motivate decision-making.

Section 3E1.1 incentivizes guilty pleas. Indeed, the PSR here makes clear that the purpose of §3E1.1 is not to give credit to those who accept responsibility but instead operates to punish those who "put the government to its burden of proof." This Guideline is but one of several "systemic pressures" that combine to persuade more than 97% of defendants to plead guilty. Carol A. Brook et. al., *A Comparative Look at Plea Bargaining in Australia, Canada, England, New Zealand, and the United States*, 57 Wm. & Mary L. Rev. 1147, 1212 (2016).

Still, "there [is] near unanimity that the federal sentencing guidelines are responsible for the decline in the criminal trial."[8] These critics agree that the Guidelines "impose a substantial penalty on a defendant who chooses to exercise his right to a trial—and since they appear to have been designed to encourage or coerce, depending upon your view, defendants to enter into plea agreements, they appear to be working."[9]

[8] Patricia Lee Refo, *The Vanishing Trial*, ABA J. of Sec. of Litigation, Vol. 30 No. 2, at 3 (2004), available at https://perma.cc/AR5Q-DT8U (last accessed May 8, 2026); *see also* Hon. Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. of Books (Nov. 20, 2014) (observing that the sentencing guidelines (along with contemporaneously enacted mandatory minimums) have "caus[ed] the virtual extinction of jury trials in federal criminal cases"); Fields and Emshwiller, *Federal Guilty Pleas Soar As Bargains Trump Trials* ("Federal [sentencing] guidelines not only toughened punishments but also formalized a system to reward defendants who plead guilty by reducing sentences if they accept responsibility or cooperate with prosecutors, among other things."). Retired U.S. District Judge Nancy Gertner has bemoaned the way the Guidelines' "acceptance of responsibility" deduction discourages litigation. Hon. Judge Nancy Gertner (Ret.), *Opinions I Should Have Written*, 110 Nw. U. L. Rev. 423, 429 (2016). Human Rights Watch observed that the "[sentencing] guidelines themselves encourage defendants to plead guilty by rewarding defendants with a two- or three-level reduction in their offense level for 'acceptance of responsibility.'" Human Rights Watch, *An Offer You Can't Refuse*, at 41.

[9] Refo, *The Vanishing Trial*, at 3; see also Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. Pa. L. Rev. 79, 129–31 (2005)

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 29

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**2.  Section 3E1.1 unconstitutionally punishes those who exercise the right to trial.**

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (cleaned up). Yet the Guidelines' trial tax does just that, albeit with the blessing of the Ninth Circuit. *See United States v. Baldrich*, 471 F.3d 1110, 1115 (9th Cir. 2006) (rejecting a Fifth and Sixth Amendment challenge to §3E1.1). This is, at least in part, because the Guideline is framed as a "reward" for accepting responsibility rather than as a "punishment" for going to trial. *See, e.g., United States v. Cervantes-Rubio*, 275 F. App'x 601, 604 (9th Cir. 2008) (collecting decisions indicating that "§3E1.1(b) should be viewed as providing incentives to plead guilty (in the form of a lower sentence), as opposed to punishing a defendant for not pleading guilty (by imposing a higher sentence)"). But, as one judge wrote, "It approaches sophistry to say in one breath that one may not be punished for exercising one's constitutional right to stand trial, and, then to say with the other, but, because he has demonstrated repentance by pleading guilty, he may have made out better." *United States v. Iager*, 849 F.2d 607 (4th Cir. 1988) (Murnaghan, J., dissenting). Judge Wald of the D.C. Circuit observed that whether a court "raise[s] [a person's] sentence because he went to trial or denie[s] [them] a shorter sentence for the same reason is irrelevant because his constitutional right was burdened either way." *United States v. Jones*, 997 F.2d 1475, 1487 (D.C. Cir. 1993) (Wald, J., dissenting).

Even the Supreme Court has implicitly suggested that, in reality, plea discounts punish:

> [Defendants] who do take their case to trial and lose receive longer sentences than even Congress or the prosecutor might think appropriate,

(hereinafter "*Trial Distortion*") (observing that one major effect of the guidelines was to make the plea discount more certain—and the larger and more certain the plea discount, the fewer trials will occur).

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

because the longer sentences exist on the books largely for bargaining purposes. This often results in individuals who accept a plea bargain receiving shorter sentences than other individuals who are less morally culpable but take a chance and go to trial.

*Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012) (quoting Rachel Barkow, *Separation of Powers*, at 1034). In a system where 97% of cases end in a plea, "it is unclear why the 'discounted' punishment imposed in that [97%] of cases should not rather be considered the norm." Gerard E. Lynch, *Screening Versus Plea Bargaining: Exactly What Are We Trading Off?*, 55 Stan. L. Rev. 1399, 1401 (2003). "Where almost no one pays the 'manufacturer's suggested retail price,' and almost everyone buys the item at a 'discounted' price, no one really gets a 'bargain,' and the product's real price is what is actually charged in the marketplace." *Id.*

Section 3E1.1(b) violates the Sixth Amendment based on the decision to exercise the right to trial and is justified entirely by the cost-saving benefit to the government. *Tavberidze*, 769 F. Supp. 3d at 270. "This cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right. Worse still, on this flimsy basis section 3E1.1(b) penalizes a defendant who just takes too long to decide whether he wants to assert his constitutional right to trial, even if he ultimately waives it." *Id.*

Although the Ninth Circuit has held otherwise, Tamara maintains that the trial/plea criteria employed by §3E1.1 to award sentencing reductions is not merely imprudent policy; it is unconstitutional. For that reason, as well, this Court should decline to enforce the trial penalty and treat Tamara "as having the equivalent of a Guidelines range three points less than what the formal Guidelines calculation would otherwise mandate." *Id.* at 273.

### B.   Tamara Accepts Responsibility for the Harm Caused

Tamara should be granted a two-level adjustment under §3E1.1. Tamara has demonstrated, through her testimony at trial and her letter to the Court, that she

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 31

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

understands and accepts the harm that her actions caused. While she challenged the legal sufficiency of the government's evidence, she never denied that people were hurt through her actions when she was following the directives of Paul. The commentary says that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." USSG §3E1.1 comment. (n.2). This does not describe Tamara. Tamara's testimony at trial is not inconsistent with her remorse, and she did not opportunistically change her position post-trial. She recognized the harm that occurred before, during, and after trial. And, as she says in her letter, even though she disagrees with the outcome, she acknowledges that the jury found her guilty and "can understand why they did so based on the evidence presented to them even if [she] disagree[s]." Ex. 2 at 3.

The commentary suggests that a person's pre-trial statements and conduct should be assessed when determining whether they should get an acceptance of responsibility adjustment post-trial. USSG §3E1.1 comment. (n.2). Here, Tamara's post-trial conduct is consistent with her pre-trial conduct. Tamara was in a very difficult situation where Paul, a person who has consistently blamed others for his conduct, left her.

## C.     Tamara Did Not Obstruct Justice

Tamara testified truthfully, consistent with her understanding of what occurred in the case. She did not testify falsely or willfully. As described in the defense's objections, Tamara regularly used the suspense category in QuickBooks, consistent with her testimony. She gave a detailed account of what happened in her businesses and in her relationship with Paul. The jury's finding is not inconsistent with her good faith, truthful testimony. The Court should decline to find an obstruction enhancement solely because the jury found Tamara guilty. As discussed more fully in the defense's motion

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 32

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

for new trial, the government's arguments and testimony relating to the use of suspense in her businesses was misleading in its attempt to discredit Tamara.

Probation appears to have applied obstruction because Tamara denied an element of guilt when she testified. Because her defense was mens rea-based, she is essentially being penalized for disagreeing with the government about what it believed her state of mind was. Instead of just accepting that it has convicted Tamara and seeking what it believes to be a fair sentence, the government now seeks a guideline enhancement that would deter others from similarly publicly disagreeing with the government on its theory of their guilt. The Court should decline to apply this enhancement.

**D.    The Fraud Guidelines Are Flawed.**

The Guidelines recommend a sentence between 121–151 months' imprisonment. Without the two-level increase under §3C1.1, the range is 97–121 months' imprisonment. But the fraud Guidelines do not recommend a reasonable starting point because they have been flawed from the start. Before the Sentencing Commission promulgated the Guidelines, it looked at sentences from 1983–85. As Mark Osler and Judge Mark W. Bennett explain:

> Even though the Sentencing Commission farmed this data, it immediately, and arbitrarily, without explanation then or now, jettisoned the nearly 50% of federal sentences where a defendant was given probation—thus hijacking realistic data from prior federal sentencing practices. To make matters worse, the Sentencing Commission abandoned the empirical approach of prior sentences, even with the skewed data of eliminating cases with probation, for a new, significantly harsher approach.

Mark Osler, Judge Mark W. Bennett, *A "Holocaust in Slow Motion?" America's Mass Incarceration and the Role of Discretion*, 7 DePaul J. for Soc. Just. 117, 140–41 (2014) (footnotes omitted).

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 33

As a result, all sentences—but particularly fraud sentences—increased dramatically after the passage of the Sentencing Reform Act. *See generally* Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 952–53 (2017); Bowman, Frank O., *Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)*, 27 Fed. Sent'g Rptr. 270–83 (2015). Over the years, the harsh critique of the fraud Guidelines by judges and scholars has been relentless. *Bennett, et. al.*, *supra*, at 973–75 (collecting opinions calling the fraud guidelines "absurd on their face," "of no help," "fundamentally flawed," "valueless," and "more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology").

Among the criticisms are that the focus on loss overstates culpability in many cases. *Bennett, et. al.*, *supra*, at 977–78 (public comment of the Federal Defender community); *id.* at 982–84 (proposing a "buzz cut" to the loss table). Critics of the Guideline emphasize that, like drug quantities, the loss amounts fail to distinguish between the least and most culpable people. *See* David Debold & Matthew Benjamin, *"Losing Ground"-in Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. Pa. L. Rev. PENNumbra 141, 151–52 (2011). In 2015, the American Bar Association proposed amending the loss table to remedy the harshness of §2B1.1. Am. Bar Ass'n, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014). Under that proposal, in this case, eight levels (instead of 18) would be added for loss between $1 million and $5 million dollars.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 34

## IV.   SENTENCING CONSIDERATIONS

A sentence must be "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to achieve the objectives of sentencing—"retribution, deterrence, incapacitation, and rehabilitation," *United States v. Tapia*, 564 U.S. 319, 325 (2011) (summarizing 18 U.S.C. § 3553(a)(2)).

These considerations "speak to the questions at the core of any system of criminal justice: What sentence does the defendant deserve? What sentence will deter criminal conduct in the future? What sentence will protect the public? And what sentence is most likely to help the defendant rehabilitate for transition back into society?" *Esteras v. United States*, 606 U.S. 185, 192 (2025). When considering whether to impose a sentence of imprisonment courts "should consider the specified rationales of punishment *except for* rehabilitation, which it should acknowledge as an unsuitable justification for a prison term." *Tapia*, 564 U.S. at 327.

By requiring a sentence to be "no greater than necessary" to achieve the objectives of § 3553(a), there must be evidence that the chosen form of punishment is necessary to accomplish these objectives.

### A.  Retribution

Punishment takes many forms, and prison is just one. Probation, fines, forfeiture, and restitution are all forms of punishment. *See United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (Forfeitures—payments in kind—are thus "fines" if they constitute punishment for an offense."); *Ellingburg v. United States*, 146 S. Ct. 564, 569 (2026) ("[T]he statutory text and structure of the MVRA demonstrate that restitution under that Act is criminal punishment."); 18 U.S.C. § 3562 (when considering whether to impose a term of probation, courts must consider all § 3553(a) factors, including retribution).

Public shame and humiliation, loss of status, and reputational harm are all a form of "just deserts." "Virtually all individuals who are convicted of serious crimes suffer

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

humiliation and shame, and many may be ostracized by their communities." *United States v. Koon*, 34 F.3d 1416, 1454 (9th Cir. 1994). "Indeed, the mere fact of conviction, without which state-sponsored rehabilitation efforts do not commence, is stigmatic." *United States v. Gementera*, 379 F.3d 596, 605 (9th Cir. 2004). The publicity of this case and the government's approach have amplified Tamara's embarrassment. The government used her ex-boyfriend, the father of her children, and her own sister to attack her character, to argue that she is a gold digger, and to advance sexist stereotypes about the types of women who are victims of abuse, manipulation, and sexual assault. Those relationships are not likely irreparably damaged. The government has demonstrated that it will use even joking text messages to a sister against you. Her face was prominently displayed in articles about her conviction.

### B.    Deterrence and Incapacitation

Rigorous scientific research consistently shows that lengthy terms of imprisonment do not deter or prevent crime—particularly when the conduct is the result of mental health or substance use disorders. In fact, lengthy periods of incarceration often have the opposite effect; incarceration is criminogenic. The University of Chicago published a meta-analysis of the deterrent effect of custodial sentences. *See* Petrich, et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, 50 Crime & Justice 353 (Sept. 22, 2021) [https://perma.cc/J7N2-9GTM]. The study's authors reviewed 116 reports and found that "custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. . . . Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism." *Id.* at 353. Indeed, if lengthy terms of incarceration improved public safety, then the United States should be the safest country in the world, but it is not. The United States incarcerates a greater percentage of its population than any other nation, including countries that have similar or higher rates of crime. Emily

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 36

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Widra, *States of Incarceration: The Global Context 2021* [https://perma.cc/WQJ5-2S6J].

Tamara is not a danger to society. Since 2019, she has not been involved in the real estate and financial business. She has lived humbly with her daughter and boyfriend in parts of the country where rent remains low. She has worked hourly, service, and gig jobs to make ends meet. She has served in her community and raised her daughter. Put simply, she is not a danger to the community.

### C.    Rehabilitation

While 18 U.S.C. § 3553(a) requires this Court to consider Tamara's need for training and medical care, 18 U.S.C. § 3582 admonishes that "imprisonment is not an appropriate means of promoting correction and rehabilitation." *Tapia*, 564 U.S. at 327, 330, 335 (discussing 18 U.S.C. § 3582(a)).

A recent report from the Office of the Inspector General found that the health care provided at FDC SeaTac is—in a word—appalling. Incarcerated people rarely see doctors, and medical providers do not respond to requests for medical care. One woman reported breast pain and never received a follow-up screening for breast cancer. Walter Pavlo, *Troubling Findings at FDC SeaTac: A 2025 OIG Inspection Report* (Sept. 10, 2025), https://www.forbes.com/sites/walterpavlo/2025/09/10/troubling-findings-at-fdc-seatac-a-2025-oig-inspection-report/ [https://perma.cc/AY5Q-5Y7Z FDC]. FDC SeaTac is not a fluke. After a lawsuit was filed alleging rampant sexual abuse at FCI Dublin, a Court Monitor issued a report documenting ongoing physical and sexual abuse and inadequate health care. *See generally* Wendy Still, Senior Monitor, U.S. Dist. Ct. N.D. Cal., *1st Public Monthly Status Report for Rating Period March 21, 2025–April 30, 2025, Cal. Coalition for Women Prisoners, et al., v. U.S. Fed. Bureau of Prisons, et al.,* Consent Decree, Case No. 4:23-cv-04155-YGR (June 30, 2025), https://drive.google.com/file/d/1eY5NHwddiUOiFMFOeUa_Nr4T7O7XzG9V/view

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 37

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

[https://perma.cc/U5JU-83QR]. FCI Dublin is now closed. There is no reason to believe the other facilities available for women are managed well or provide medical and psychological care effectively. Tamara's continued access to quality psychological counseling is critical and undermined by incarceration.

For seven years, Tamara has demonstrated that she can live in the community without causing harm to others. Since October 2023, she has been subject to court supervision, maintained compliance, and has proven she is amenable to supervision, which includes financial monitoring and mental health counseling. Release Status Report at 2–3. The community has been safe, and Tamara has been an active, positive member in each community in which she resided. *See* Ex. 8 at 1; Ex. 28.

**D.    Sentence Disparities**

Section 3553(a) "does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (affirming sentence of probation for defendant convicted of bankruptcy fraud and false statements to a bank with a previous conviction for theft from banks). The Supreme Court has described probation conditions as "substantially restrict[ing a defendant's] liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). Tamara has proven the ability to comply with probation conditions. There is no reason to believe these restrictions on her liberty are insufficient to effectuate to purposes of sentencing— particularly those of both general and specific deterrence, which this Court identified as the primary reason for imposing a 33-month sentence for Paul. *See* Waln Sent'g Hr'g Tr. at 17–18.

Sentencing courts must avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Paul is the most similar and appropriate comparison. Like Paul, Tamara does not have a criminal history. The offense variables should be the same.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 38

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Although Tamara was convicted of additional offenses, that should not change the calculus. Part of Paul's plan was to have a wife whose income supported his lifestyle. He was the one who told Tamara to treat the transfers as loans for tax purposes to avoid having to pay additional income tax. He personally benefitted from this arrangement because he lived in the same home and even demanded to live in the penthouse, when she lived in a smaller apartment in the same building. The money transferred from The Waln Team Accounts to Tamara's personal account went to pay a large credit card debt they accumulated together.

Nor should Paul get greater credit for accepting responsibility than Tamara just because he pled guilty. She has acknowledged harm to the Halycon investors and her role in their losses. *See* Ex. 2. The letter from Paul's ex-wife, which blames his attorneys for doing nothing and forcing him to plead guilty, offers insight into what he tells people in private about his culpability. Significantly, unlike Tamara, he did not adjust his lifestyle or his behavior after the Halycon syndication failed. He went right back to living a luxury lifestyle on other people's dime and amassing debts.[10] Most significantly, he was the person who solicited investors' hard-earned money, made them promises, and lied to them. He was the one who authorized and directed the flow of cash from Halcyon to The Waln Team and to his and Tamara's personal benefit. Dkt. 90-1 ("I authorized a number of transfers of investor funds that were used for unauthorized purposes."). And, according to the government, Paul lied to the FBI multiple times.

Tamara was not more responsible than Paul for the total loss amount to investors after the divorce. The business relationship between Paul and Tamara continued after the personal relationship ended. Paul remained the CEO and continued to direct the

---

[10] Paul was also represented by private counsel for years and had to request court-appointed counsel only after his divorce from his third wife. Tamara has always been unable to retain private counsel.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 39

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

flow of money. Under the terms of the post-nuptial agreement, Tamara continued to pay his living expenses. For example, she paid over $6,000 monthly for his penthouse apartment and a little more than $4,000 monthly for her own. Ex. 29 at 2–3. When Paul moved into a home, she paid his rent deposit and rent. *See, e.g.*, *id.* at 3-4 (payments to Parupudi & Modali). Tamara paid for his moving and legal expenses related to his bankruptcy, spousal maintenance dispute, and to Howard Choder. *See, e.g.*, *id.* at 2 (Buetow Law); *id.* at 3, 5, 9 (Howard Choder); *id.* at 5 (Wenokur Riordan PLLC for bankruptcy); *id.* at 4, 6, 8 (V. Freitas Law, PLLC). She paid for his Ford truck, *id.* at 4 ($16,258.27 "Ford Transfer), Bellevue Club membership, *id.* at 12 ($3,632.16 in May 2019), and provided him with cash or direct payments, *e.g.*, *id.* at 10 ($10,600 on 12/31/18). And Paul asked Tamara to book vacations for him in July 2018. Ex. A-856. In addition, he used $156,477 to pay Sheryl Waln was transferred after their divorce. In total, at least $755,365.63 went to pay Paul or his personal expenses while he was CEO or a consultant for HTI Wealth/The Waln Team. 30 at 4. This does not account for the cost of all other joint and other expenses Tamara paid during their marriage.[11]

In any event, in one sense, Tamara may still be punished more severely than Paul. The government seeks over $3 million in forfeiture from her,[12] dkt. 215, and his forfeiture judgment is limited to only the amount he took to pay his ex-wife, dkt. 92. Because Tamara paid all his personal expenses, there is a significant chance she will be saddled with higher debt than he. To punish Tamara more severely with a lengthier prison sentence amounts to a trial tax.

A lengthy prison sentence would create an unwarranted disparity between Tamara and other defendants convicted of fraud in this district. In 2025, the median

---

[11] It is not possible to identify which purchases during the marriage went to benefit Paul personally or the family.

[12] Tamara contests this amount.

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 40

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

sentence imposed in this district for fraud offenses was 12 months' incarceration. The mean sentence imposed was 22 months. U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2025, Western District of Washington* 11, Table 7, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2025/waw25.pdf. Probation-only sentences were imposed in 23.7% of fraud cases. *Id.* at 9, Table 5. A few examples illustrate this point. In *United States v. Sergei Potapenko*, Judge Lasnik imposed a time-served sentence with three years of supervised release, community service, and a $25,000 fine for two defendants who orchestrated a $577 million cryptocurrency scheme. No. 22-CR-185-RSL (W.D. Wash. 2025), Dkt. 237. They used the over $400,000 million personally received to buy luxury real estate and cars. In *United States v. Clevenger*, a fraudster responsible for embezzling nearly $1 million in taxpayer funds was sentenced to a term of probation. 25-cr-05102-TMC. In *United States v. Shetty*, after a jury trial, the court imposed a 24-month sentence for a fraud that resulted in a $35 million loss. 23-cr-084-TL, Dkt. 329. A non-custodial sentence or a sentence below 33 months' imprisonment would not create any unwarranted sentence disparities.

The victims have a range of views about the appropriate outcome. Some wish a lengthy period of incarceration. One victim does not wish to see Tamara incarcerated and believes "the most constructive outcome is for the defendant to remain employed and be required to pay restitution." PSR ¶ 44. All victims wish to be repaid. Sentencing must also consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). And it is true, the path to faster repayment is for Tamara to remain in the community working. The most she can earn in custody is $0.40/hour. Fed. Bureau of Prisons, *Work Programs*, https://www.bop.gov/inmates/custody_and_care/work_programs.jsp (last accessed May 8, 2026).

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 41

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

## V.   CONCLUSION

Tamara King is deeply remorseful for her role in causing harm to the Halcyon investors. She is committed to working consistently to repay the victims. A carceral sentence is not necessary to achieve the objectives of punishment. If the Court imposes a term of imprisonment, however, her sentence should be no longer than 33 months.

DATED this 8th day of May 2026.

Respectfully submitted,

s/ *Colleen P. Fitzharris*
s/ *J. Leonardo Costales*
Assistant Federal Public Defenders
Attorneys for Tamara King

DEFENSE SENTENCING MEMORANDUM
(*United States v. King*, CR23-159-RSM) - 42

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**